UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| TOY APHAYVONG, | ) | 1:04cv6020 DLB |
| | ) | |
| | ) | |
| Plaintiff, | ) ) | ORDER REGARDING PLAINTIFF'S SOCIAL SECURITY COMPLAINT |
| v. | ) | |
| | ) | |
| JO ANNE B. BARNHART, Commissioner of Social Security, | ) ) | |
| | ) | |
| Defendant. | ) ) | |

## BACKGROUND

Plaintiff Toy Aphayvong ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for supplemental security income pursuant to Title XVI of the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Dennis L. Beck, United States Magistrate Judge.[1]

## FACTS AND PRIOR PROCEEDINGS[2]

Plaintiff filed an application for supplemental security income on June 18, 1999. AR 150-153. She alleged that she had been disabled since July 15, 1981, due to mental illness. AR

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge. On December 6, 2004, the Honorable Robert E. Coyle reassigned the case to the undersigned for all purposes.

[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

1

187. After being denied both initially and upon reconsideration, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). AR 113-116, 119-122, 133-134. On May 10, 2001, ALJ James Ross held a hearing. AR 50-65. On June 6, 2001, ALJ Ross denied Plaintiff's claim. AR 106-112. Plaintiff requested review and the Appeals Council vacated the decision and remanded the case. AR 137, 141-145.

On May 13, 2003, ALJ Ross held a second hearing. AR 66-82. ALJ Ross denied Plaintiff's claim on September 17, 2003, finding that Plaintiff could still perform a wide range of work. AR 14-22. The Appeals Council denied review on June 4, 2004. AR 8-11.

<u>Hearing Testimony</u>

*First Hearing*

On May 10, 2001, ALJ Ross held a hearing in Fresno, California. AR 50. Plaintiff appeared, along with her attorney Robert Christenson. AR 50. An interpreter also appeared. AR 50.

Plaintiff testified that she could not remember her date of birth or how old she was. AR 56. She was not currently married and had four children. AR 56. She could not remember if she went to school in Laos. AR 56. She lives by herself. AR 56. She cannot read, write or understand English, and cannot read or write Laotian. AR 57. She cannot tell time or make change. AR 57.

She testified that she did not know when she came to the United States and cannot remember if she worked here. AR 57. When asked if she had worked in chicken processing, she stated that she did not remember. AR 57. She testified that she remembered living in another state, and that it may have been Arkansas. AR 58. She then explained that she used to live in Fort Smith, Arkansas. AR 58.

She was unable to explain why she could not work. AR 59. She testified that she used to live in Stockton and that her husband left her. AR 59. Her husband took one of her children back to Laos with him. AR 59-60. She has lived on the streets, but people let her live in their garages. AR 59.

She does not do anything for fun and does not sleep well. AR 60. She wants to die and feels that life is not worth living because she had no place to live. AR 60.

Her oldest child lives with her. AR 60. She does nothing during the day. AR 60. She testified that she takes her medications and then goes to sleep. AT 60-61. Someone else does the household chores, laundry and shopping. AR 61. She does not have a car and does not know how to drive. AR 61.

When asked if she had physical problems that keep her from working, she explained that she has headaches, is in pain all over her body, and cannot carry any heavy object. AR 61. She stated that she could lift anything, but is in pain, especially in her stomach. AR 62. She can lift a gallon of milk, but has stomach pains. AR 62.

She explained that she gets headaches every day and every night, but then testified that she has headaches two or three times a week. AT 63. Every time she gets upset, she gets a headache. AR 63. The headaches last all day and all night and are severe enough to keep her from working. AR 63. When she gets headaches, she takes medication and then goes to bed. AR 64.

She also testified that she has seizures, and explained that she starts feeling numb all over her body, and then goes to use the bathroom. AR 64. She feels suddenly very tired and sometimes falls. AR 64. This happens two or three times per month. AR 65.

*Second Hearing*

On May 13, 2003, ALJ Ross held a hearing in Fresno, California. AR 66. Plaintiff appeared, along with her attorney Robert Christenson. AR 66. An interpreter also appeared. AR 66.

Plaintiff testified that she was living in an apartment with her two children, but that she could not remember their ages. AR 75. Her son is on disability. AR 76.

She does not remember when she came to the United States, but she has been here more than 10 years. AR 76. She worked for about five years at a chicken factory while she was in Fort Smith, Arkansas. AR 76-77. She had to stop working because she was sick. AR 77. She hasn't worked since she lived in Fort Smith. AR 77.

She goes to "mental health" in Porterville once a month. AR 77. She takes medication. AR 78.

She cannot work because she has "disease." AR 78. She goes to mental health because her doctors told her that if she does not take medication, she will have to be hospitalized. AR 78. She said she could not work because she has "dizziness sometime." AR 78. She explained that she applies for jobs but that people don't accept her. AR 79. When asked if she could handle work, she said, "I don't know, but what I know is they don't accept me at - for a job." AR 79.

When asked about earnings in 1997, 1998 and 1999, Plaintiff explained that she lost her wallet two times during that period and that her Social Security card was in her wallet. AR 80. She testified that she did not earn this money. AR 80.

Plaintiff explained that her medication makes her sleep. AR 80-81. She stays home during the day, while her children are at school. AR 81. Although she sometimes makes cookies, her children cook the meals. AR 81. She does not have a driver's license and cannot read or write in any language. AR 81.

Relevant Medical Evidence

Plaintiff was treated at Tulare County Mental Health beginning on April 10, 1996. AR 377. Treatment notes indicate that Plaintiff failed to attend her appointments on numerous occasions and failed to comply with treatment recommendations. AR 295, 296, 297, 299, 300, 306. On June 26, 1996, Niranjan Sharma, M.D., diagnosed Plaintiff with depressive disorder, not otherwise specified, with post traumatic stress disorder features. AR 534.

On June 26, 1998, Michael S. Barnett, M.D. performed a consultive psychiatric evaluation. AR 278. At the beginning of his report, Dr. Barnett stated that Plaintiff was very vague in her answers and that he felt she was "playing stupid." AR 278. He also believed that when Plaintiff broke down in tears in response to a question, it was "inappropriate and was an attempt to make her look sicker than she was." AR 278. Plaintiff told Dr. Barnett that she stays home during the day and cleans her house and yard, dresses and bathes herself, and can cook. AR 278. She said she does not look for work because she does not know how to find a job; a

friend suggested that she apply for SSD.  AR 278.  Plaintiff's chief complaint was, "When I do heavy work, my heart hurts."  AR 279.

Upon examination, Dr. Barnett felt that she sometimes answered his questions before the interpreter asked them in her language and that she was uncooperative.  AR 279.  He believed that Plaintiff's psychiatric symptoms were vague and nondescriptive and did not fit any psychiatric syndrome.  AR 279.  He opined that Plaintiff was malingering.  AR 280.  He felt she could follow simple one or two step instructions, could manage the stress of an eight hour workday, and if the language barrier was overcome, could relate to peers, supervisors and customers.  AR 280.

On July 7, 1998, Evangeline Murillo, M.D., completed a Psychiatric Review Technique Form.  AR 282.  Dr. Murillo believed that Plaintiff suffered from depressive disorder, not otherwise specified.  AR 285.  Dr. Murillo opined that Plaintiff would have a slight limitation in activities of daily living and maintaining social functioning.  AR 289.  She would have seldom limitations in concentration, persistence or pace.  AR 289.  In a Mental Residual Functional Capacity Assessment, Dr. Murillo opined that Plaintiff would be moderately limited in understanding, remembering and carrying out detailed instructions.  AR 291.  She would be capable of performing simple repetitive tasks and could interact and adapt to such tasks.  AR 293.

On August 12, 1998, Dr. Chin noted that Plaintiff was stable and that with medication, her depression had improved somewhat.  AR 298.  Plaintiff reported no side effects.  AR 298.

On October 6, 1998, a State Agency physician completed a Psychiatric Review Technique Form.  AR 307.  After reviewing the evidence, the physician concluded that because of Plaintiff's lack of credibility observed by two different professionals, Plaintiff could not be assumed to have any problems whatsoever.  AR 308.  He concluded that the evidence was consistent with malingering.  AR 308.

On August 15, 1999, Plaintiff was examined by consultive psychiatrist Federico J. Banales, M.D.  AR 341.  Plaintiff stated that she was not able to work because of pain in her chest.  AR 341.  Upon examination, Dr. Banales found Plaintiff to be "extremely inconsistent."

"She is very clearly able to state her problems without any confusions whatsoever. As far as the rest of the interview is concerned she immediately becomes stupid and is not able to provide any information and cannot do anything at all." AR 345. Dr. Banales believed that Plaintiff was malingering. AR 345. He noted that Plaintiff's documentation suggested that she knew some English, but that she was totally dependent on the translator. AR 345.

On June 6, 2000, an adult assessment at Tulare County Mental Health indicated that Plaintiff suffered from major depression, recurrent, in partial remission, acculturation problems and non-compliance with treatment. AR 373.

On July 24, 2000, Plaintiff was evaluated by Leslie H. Lessenger, Ph.D. AR 362. Dr. Lessenger found that the results of the evaluation were not consistent with malingering, and that Plaintiff was "sincerely distressed and depressed." AR 366. She diagnosed Plaintiff with major depression, recurrent, by history and symptoms, and opined that Plaintiff's difficulties were exacerbated by external pressures, including a history of abuse and war trauma, separation from her children, and apparent significant problems in raising her sons. AR 366. She explained that Plaintiff has an understandable history of attempting to find others, including doctors, who will take care of her, and that this is due more to environmental circumstances and limited intellectual/educational resources than a personality disorder. AR 366. She recommended that Plaintiff enroll in job training or vocational program. AR 367.

On February 9, 2001, Plaintiff saw Andrew Zabiega, M.D., at the Porterville Adult Clinic. AR 400. Dr. Zabiega diagnosed Plaintiff with bipolar disorder with possible psychotic features, major depressive disorder, and post traumatic stress disorder. AR 400. He placed her on medication. AR 400.

Plaintiff saw Dr. Zabiega on April 13, 2001. AR 391. Dr. Zabiega noted that her compliance was good and that her current level of care was satisfactory. AR 391. He adjusted her medications and instructed her to return in two months. AR 391.

On June 13, 2001, Plaintiff returned to Dr. Zabiega. AR 517. He noted that Plaintiff was not sleeping well, was depressed, and that her social security petition was rejected. AR 517. He believed that the decision was not justified because the record was not properly reviewed, she has

been treated for a long time for depression, has extensive records stating that she was complaint with her medication, and was not stupid as suggested. AR 517. He noted that Plaintiff's condition was stable and her compliance was very good. AR 517. He diagnosed bipolar disorder with depressive symptoms and post traumatic stress syndrome. AR 517.

On August 8, 2001, Plaintiff saw Paul Bong, M.D. at the Porterville Adult Clinic and requested a medication change. AR 506. Dr. Bong noted a history of depression, without any current evidence of psychosis. AR 506. He opined that Plaintiff was clinically stable. AR 506.

On February 22, 2002, Plaintiff underwent a psychiatric evaluation by Dr. Barnett. AR 427. Her chief complaint was that she gets scared at night. AR 427. Dr. Barnett noted that Plaintiff was barely functioning on a day-to-day basis and has had a very poor acculturation from Laos to the United States. AR 428. He diagnosed her with depressive disorder and psychiatric disorder. AR 428. He concluded that she is unable to work because of her poor level of functioning, and would be unable to understand, remember and carry out simple one or two-step job instructions. AR 428. He opined that Plaintiff's problems "appeared to be chronic and unresolvable." AR 429.

On March 10, 2002, Plaintiff was evaluated by Harpreet S. Sandhu, M.D. AR 430. Dr. Sandhu diagnosed Plaintiff with depression and personality disorder by history, stable on medication, generalized pain, nonspecific, and headaches relieved by medication. AR 431. He opined that, upon examination, Plaintiff did not have any kind of physical disability that would incapacitate her in any way. AR 431. As for her complaints of anxiety, depression and personality disorder, he noted that Plaintiff "did not show any lability of mood or features of anxiety acutely during this time of evaluation, however, that needs to be evaluated by the appropriate consultant." AR 431.

On April 10, 2002, State Agency physician Evangeline Murillo completed Mental Residual Functional Capacity Assessment form. She opined that Plaintiff would be moderately limited in her ability to understand, remember and carry out detailed instructions. AR 432. She further opined that Plaintiff was capable of following simple instructions, and would be able to

interact, socialize and adopt to work changes. AR 434. These findings were affirmed by State Agency psychiatrist Archimedes Garcia, M.D. on September 27, 2002. AR 434.

Also on April 10, 2002, Dr. Murillo completed a Psychiatric Review Technique form and opined that Plaintiff suffered from depressive disorder, not otherwise specified. AR 439. Plaintiff would have mild limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. AR 446. She noted that Plaintiff was not very credible. AR 448. State Agency physician Brian Ginsburg, M.D. agreed with these findings. AR 452.

On April 17, 2002, Plaintiff saw Jonathan Tatomer, M.D. at the Porterville Adult Clinic for a psychiatric evaluation update. AR 463. She complained of physical pain, headaches and anger. AR 463. Although she indicated that she was taking her medications, Dr. Tatomer noted that she could not have been because she hadn't been seen at the clinic for almost five months. AR 463. He diagnosed her with depressive disorder with psychotic features and post traumatic stress disorder by history. AR 464. He also noted her separation issues, cultural estrangement, isolation and illiteracy. AR 464.

On May 15, 2002, Dr. Tatomer saw Plaintiff and described her as very snappy and impatient. AR 455. Plaintiff described difficulty with her son. AR 459. She was sleeping well and her depression seemed to be situational. AR 459. She was not psychotic and did not seem to be depressed. AR 459.

On July 16, 2002, Plaintiff met with Dr. Tatomer. AR 454. She was less angry and less objectionable than in the past and seemed less depressed. AR 454. There was no evidence of anxiety. AR 454. She was scheduled to meet with Dr. Tatomer on September 10, 2002, but failed to keep the appointment. AR 553.

On September 18, 2002, Plaintiff saw Steven Eklund, M.D., at the Porterville Adult Clinic. AR 552. Plaintiff reported that she was feeling better on her medications and wanted to continue on her medications. AR 552. She reported having anger episodes during the week, but on the days when she does not have such episodes, she does quite well. AR 552. He diagnosed depression, not otherwise specified and personality disorder not otherwise specified. AR 552.

1  Plaintiff saw Dr. Tatomer on January 15, 2003.  She was last seen in the clinic four
2 months ago because she went to visit a relative and got stranded without a car.  AR 556.
3 Although she stated that she took her medication in a reduced fashion to make it last, Dr.
4 Tatomer noted that a review of the chart makes this difficult to believe.  AR 556.  She indicated
5 that she was doing well, was not depressed, and was sleeping well.  AR 556.
6  On May 8, 2003, Plaintiff met with Ameer Dahar, M.D., at the Porterville Adult Clinic.
7 AR 558.  There was no evidence of depression, anxiety or psychosis.  AR 558.
8  Allan Hedberg, Ph.D., a medical expert, reviewed Plaintiff's records at the request of the
9 ALJ.  In his report dated August 21, 2003, he concluded that Plaintiff's level of depression was
10 non-severe and situationally generated, primarily due to the divorce, her daughter living in Laos
11 and the social and aggressive problems of the son living with her.  AR 559.  He found Plaintiff to
12 be more troubled and depressed than would have been the case had she been compliant and
13 sought to benefit from the services available to her.  AR 560.  He opined that the allegation of
14 depression is supported by the record, but at a non-severe level and is situationally based.  AR
15 561.  He stated, "[u]nfortunately, the record appears to be more serious through the eyes of some
16 of the professionals who have met with her but not so through the eyes of other professionals."
17 AR 561.  He attributed this difference to the "observations of many that she has been malingering
18 and attempting to use the welfare system to her advantage."  AR 561.
19  ALJ's Findings
20  The ALJ determined that Plaintiff had the severe impairment of depressive disorder, not
21 otherwise specified.  AR 18.  He found, however, that Plaintiff had the residual functional
22 capacity ("RFC") to perform work at all exertional levels involving simple, repetitive tasks with
23 little or no interaction with the public.  AR 18.  He found Plaintiff not entirely credible.  AR 18.
24  **SCOPE OF REVIEW**
25  Congress has provided a limited scope of judicial review of the Commissioner's decision
26 to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations,
27 the Court must determine whether the decision of the Commissioner is supported by substantial
28 evidence.  42 U.S.C. 405 (g).  Substantial evidence means "more than a mere scintilla,"

*Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance. *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Jones v. Heckler,* 760 F.2d 993, 995 (9th Cir. 1985). In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must uphold the Commissioner's determination that the claimant is not disabled if the Secretary applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

## REVIEW

In order to qualify for benefits, a claimant must establish that he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c (a)(3)(A). A claimant must show that he has a physical or mental impairment of such severity that he is not only unable to do her previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden is on the claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, inter alia, a five-step sequential disability evaluation process. 20 C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f) (1994).[3] Applying this process in this case, the ALJ

---

[3] All references are to the 2000 version of the Code of Federal Regulations unless otherwise noted.

found that Plaintiff: (1) had not engaged in substantial gainful activity since June 18, 1999[4]; (2) has an impairment or a combination of impairments that is considered "severe" (depressive disorder, not otherwise specified) based on the requirements in the Regulations (20 CFR §§ 416.920(b)); (3) does not have an impairment or combination of impairments which meets or equals one of the impairments set forth in Appendix 1, Subpart P, Regulations No. 4; (4) may not have past relevant work; (5) but retains the RFC to perform work existing in significant numbers in the national economy. AR 20-21.

Plaintiff argues that the ALJ (1) erred in failing to find that Plaintiff has a mental impairment precluding work; (2) erred in rejecting the February 22, 2002, report of Dr. Barnett; (3) erred in failing to use a Vocational Expert; and (4) erred in assessing Plaintiff's credibility.

## DISCUSSION

A.   ALJ's Finding that Plaintiff Was Not Disabled

Plaintiff contends that the ALJ erred in failing to find that she has a mental disorder that precludes work. Specifically, she contends that the reports of several physicians establish a disabling mental disorder, that Dr. Hedburg's report was incomplete and erroneous, and that the opinions of her treating physicians should be given greater weight.

1.   Reports of Disabling Mental Disorder

Plaintiff first points to the assessments of treating physicians Dr. Zabiega and Dr. Tatomer, and the assessments of consultive examiners Dr. Lessenger and Dr. Barnett (his February 22, 2002 assessment) in support of her position that she has a disabling mental condition. She points to numerous diagnoses as well as evidence that she was not malingering.

In determining that Plaintiff was not disabled, the ALJ reviewed the medical evidence, including treatment received from the Tulare County Mental Health Department (Drs. Zabiega and Tatomer), and consultive examinations performed by Drs. Lessenger and Barnett. He noted

---

[4] The ALJ noted that it was unclear whether Plaintiff has past relevant work or has engaged in substantial gainful activity since filing her initial application, as her earnings record shows self-employment earnings in 1997, 1998 and 1999. AR 18. When asked at the hearing about this, she explained that her wallet, which included her Social Security card, had been stolen twice during this period. AR 80. The ALJ found it "unreasonable" that anyone who found Plaintiff's social security card and worked under her name would have reported the income as self-employment. AR 18.

11

that while she received treatment through the Tulare County Mental Health Department, she was diagnosed with major depressive disorder, post traumatic stress disorder, bipolar disorder and personality disorder. AR 19. He also noted that during this time, however, she was non-compliant with her medications and often missed appointments, and that when she was compliant, she had no symptoms. AR 19. He also cited evidence, including Dr. Lessenger's finding, that suggested that Plaintiff's mental problems were predominantly situational. AR 19.

Plaintiff's medical record contains numerous conflicting reports. Some doctors feel she is malingering, while others feel she cannot work. For example, Dr. Barnett, gives conflicting opinions as to Plaintiff's disability. In 1998, he believed that Plaintiff was malingering and that she could follow simple one or two step instructions, could manage the stress of an eight hour workday, and if the language barrier was overcome, could relate to peers, supervisors and customers. AR 280. In 2002, however, Dr. Barnett opined that Plaintiff was unable to work because of her poor level of functioning, and would be unable to understand, remember and carry out simple one or two-step job instructions. AR 428. He thought Plaintiff's problems "appeared to be chronic and unresolvable." AR 429.

Plaintiff's citation to favorable evidence does not render the ALJ's decision improper. The ALJ is responsible for resolving conflicts in the medical evidence. *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989). Indeed, the court must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation. *Id.* Here, although certain reports favored a finding of disability, numerous reports suggested that Plaintiff was malingering or simply was not disabled to the extent alleged. For example, Plaintiff points to Dr. Lessenger's conclusion that she was not malingering. However, Dr. Lessenger also found that Plaintiff has a history of attempting to find others, including doctors, who will take care of her, and that this is due more to environmental circumstances and limited intellectual/educational resources than a personality disorder. AR 366. Rather than find Plaintiff disabled, she recommended that Plaintiff enroll in a job training or vocational program. AR 367.

2.     Dr. Hedberg's Report

Next, Plaintiff argues that Dr. Hedberg's finding that her condition was non-severe was erroneous because he failed to mention and "apparently did not review" Dr. Barnett's February 22, 2002, assessment.

The ALJ requested that medical expert Dr. Hedberg review Plaintiff's medical record. He concluded that Plaintiff's level of depression was non-severe and situationally generated. AR 559. He found Plaintiff to be more troubled and depressed than she would have been had she complied with treatment and requested help from the services available to her. AR 560. He stated, "[u]nfortunately, the record appears to be more serious through the eyes of some of the professionals who have met with her but not so through the eyes of other professionals." AR 561. He attributed this difference to the "observations of many that she has been malingering and attempting to use the welfare system to her advantage." AR 561.

In support of his finding that Plaintiff was not disabled, the ALJ relied in part on Dr. Hedberg's findings. AR 20. Plaintiff contends that this was in error because Dr. Hedberg's report was erroneous and incomplete because he did not "mention" or "review" Dr. Barnett's February 22, 2002, finding that Plaintiff was disabled. In his report, Dr. Hedberg stated that he "considered the medical records as provided." AR 559. This presumably included Dr. Barnett's February 22, 2002, report. Indeed, Dr. Hedberg does not cite to *any* specific report but rather sets forth his impression from his overall review of the medical records. AR 561. A medical expert's testimony constitutes substantial evidence where, as here, he or she provides a specific rationale and narrative justifying his opinion, and where he or she is not contradicted by all other evidence. *Morgan v. Apfel*, 169 F.3d 595, 600 (9th Cir. 1999).

3.     Opinions of Treating Physicians

In a related argument, Plaintiff contends that the ALJ failed to adopt the treating physicians' opinions that Plaintiff was disabled. She argues that the opinion of Dr. Zabiega that Plaintiff was not malingering should be given greater weight than the opinions of non-treating consultants who believed Plaintiff was malingering.

It is true that the medical opinion of a claimant's treating physician is entitled to "special weight." *Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir. 1988); *Valencia v. Heckler*, 751 F.2d 1082, 1088 (9th Cir. 1985). However, a treating physician's opinion is not conclusive as to a physical condition or the ultimate issue of disability. *Magallanes*, 881 F.2d at 751; *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992). An ALJ may reject a contradicted treating physician's opinion on the basis of clear findings that set out specific, legitimate, reasons for the rejection. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).

First, a review of the ALJ's decision reveals that it does not hinge on whether or not Plaintiff was malingering. In other words, the ALJ did not find Plaintiff not disabled solely based on the reports of possible malingering. Indeed, the ALJ specifically states, "The claimant may or may not be malingering." AR 19. Plaintiff's focus on this issue therefore does not undercut the ALJ's opinion.

Second, to the extent the ALJ rejected the opinions of Plaintiff's treating physician, he did so properly. Her treating physicians set forth little more than diagnoses- they do not suggest that Plaintiff has any limitations. In any event, the ALJ noted that during her treatment, she was consistently non-compliant and missed many appointments. AR 19. He also noted that when she was compliant, she had no symptoms. AR 19. Moreover, Plaintiff's most recent treatment notes from 2002 and 2003 suggest that she was improving significantly. On May 15, 2002, Plaintiff was sleeping well and her depression seemed to be situational. AR 459. Dr. Tatomer noted that she was not psychotic and did not seem to be depressed. AR 459. On July 16, 2002, Dr. Tatomer described her as less angry and less objectionable than in the past, and found that she seemed less depressed. AR 454. On September 18, 2002, Plaintiff told Dr. Eklund that she was feeling better on her medications. AR 552. On January 15, 2003, Plaintiff told Dr. Tatomer that she was doing well, was not depressed, and was sleeping well. AR 556. On May 8, 2003, Dr. Dahar found no evidence of depression, anxiety or psychosis. AR 558.

B.      Dr. Barnett's February 22, 2002 Report

Plaintiff next argues that the ALJ erred in rejecting Dr. Barnett's February 22, 2002, report. Specifically, she argues that the ALJ erred by stating that none of the treating

psychiatrists indicate that Plaintiff cannot work. She also argues that the ALJ erred by relying on the non-examining, non-treating opinion of Dr. Hedberg's rather than Dr. Barnett's current opinion.

The Regulations provide progressively more rigorous tests for weighing medical opinions as the ties between the source of the opinion and the individual become weaker. SSR 96-6p. Generally more weight is given to the opinion of a source who has examined the plaintiff than to the opinion of a source who has not examined the plaintiff. 20 C.F.R. 404.1527(d)(1). The opinions of the State Agency medical consultants can be given weight only insofar as they are supported by evidence in the case record, considering such factors as the supportability of the opinion in the evidence, including any evidence received at the administrative law judge and Appeals Council level that was not before the State Agency, the consistency of the opinions with the record as a whole, including other medical opinions, and any explanation for the opinion provided by the State agency medical consultant. SSR 96-6p.

The opinions of non-treating physicians are substantial evidence where they are supported by clinical findings and objective tests. *See Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). When the ALJ rejects the opinion of an examining physician in reliance on the non-examining physician, "reports of the nonexamining advisor need not be discounted and may serve as substantial evidence when they are supported by other evidence in the record and are consistent with it." *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995).

Here, the ALJ explained that he gave less weight to Dr. Barnett's restrictive February 22, 2002, opinion, than to the previous psychiatric opinions which indicated that Plaintiff could do at least simple, repetitive tasks. AR 20. He explained, "None of the claimant's several treating psychiatrists have stated that the claimant cannot work; several of them have reported that her condition is stable without any symptoms." AR 20. He also noted that the opinion of Dr. Hedberg contradicted Dr. Barnett's February 22, 2002, opinion. AR 20.

Plaintiff first claims that the ALJ erred by finding that none of her treating psychiatrists stated that she could not work, and points to Dr. Zabiega's statement that Plaintiff "was rather unable to work on a constant basis . . ." AR 517. Dr. Zabiega made this statement in his

15

narrative describing why he felt Plaintiff's social security application was incorrectly denied. Even if this vague statement could be construed as a limitation, the ALJ's misstatement does not make his rejection improper. Indeed, apart from Dr. Zabiega's comment, none of the treating doctors limited Plaintiff in any way, and this stands in stark contrast to Dr. Barnett's opinion that Plaintiff was unable to work at *any* level. A great majority of the evidence certainly supports the consultive doctors' opinions. SSR 96-6p.

Plaintiff's claim that the ALJ should have relied on Dr. Barnett's current consultive opinion rather than the opinion of Dr. Hedberg also fails. As previously discussed, the ALJ is entitled to rely on a non-examining source when the opinion is supported by other evidence in the record and is consistent with it. *Andrews,* 53 at 1041. Dr. Hedberg's opinion is supported by, and is consistent with, a majority of the medical opinions.

C.   <u>Use of a Vocational Expert</u>

Plaintiff argues the ALJ should have used a vocational expert ("VE") to explain what job exists for a person who is 46 years old, illiterate, unable to communicate in English, with no past relevant work experience, but who could perform simple, repetitive tasks with little or no interaction with the public. In a very brief argument, Plaintiff appears to contend that the limitation to simple, repetitive tasks with little or no interaction with the public is a non-exertional limitation that required the testimony of a VE.

In general, where a claimant suffers only from exertional limitations, the ALJ may apply the Grids at step five to match the claimant with the appropriate work. *Reddick v. Chater*, 157 F.3d 715, 729 (9th Cir. 1998). The ALJ may apply the Grids in lieu of taking VE testimony only when the Grids accurately and completely describe the claimant's abilities and limitations. *Id.* (citing *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)). If a claimant's non-exertional limitations "significantly limit the range of work" he can perform, mechanical application of the grids is inappropriate and a vocational expert would be needed to describe what, if any, jobs existed in the national economy that the claimant could perform. *Desrosiers v. Secretary of Housing and Health Services*, 846 F.2d 573, 577 (9th Cir. 1988). The determination of whether

a non-exertional limitation significantly limits the range of work the claimant is able to perform is left to the ALJ. *Id.*

The ALJ determined that Plaintiff retained the RFC to perform work at all exertional levels involving simple, repetitive tasks with little or no interaction with the public. AR 20. He found no exertional limitations. Considering her age, education, and work experience, the ALJ determined that section 204.00 directed a conclusion of not disabled. AR 21. He specifically found that Plaintiff's mental limitations did not significantly affect her ability to perform a broad range of unskilled work at all exertional levels, therefore making reliance on the Grids proper. AR 21.

Respondent contends that this is "an unusual instance where reliance on the Guidelines, without seeking the testimony of a vocational expert, is permissible despite the existence of a significant non-exertional limitation." According to Respondent, Plaintiff's limitation to simple work with little or no interaction with the public is adequately dealt with under the Guidelines - because she did not have any exertional limitations, the ALJ did not have to rely upon one particular, exertionally-based, Guideline. Respondent points to SSR 85-15, which states:

> Where there is no exertional impairment, unskilled jobs at all levels of exertion constitute the potential occupational base for persons who can meet the mental demands of unskilled work. These jobs ordinarily involve dealing primarily with objects, rather than with data or people, and they generally provide substantial vocational opportunity for person with solely mental impairments who retain the capacity to meet the intellectual and emotional demands of such jobs on a sustained basis.

Although Respondent's argument that a significant non-exertional limitation exists contradicts the ALJ's finding, the ALJ properly relied on the Grids. Pursuant to *Desrosiers*, the ALJ determined that Plaintiff's limitations, where she could perform work at all exertional levels, did not significantly erode the occupational base to preclude reliance on the Grids. Such a conclusion is certainly logical given that Plaintiff could perform unskilled work at *every* exertional level. Moreover, Plaintiff's limitation to little or no interaction with the public would not seem to significantly erode the occupational base given that unskilled jobs "ordinarily involve dealing primarily with objects, rather than with data or people..." SSR 85-15.

Finally, to the extent that Plaintiff points to her age, illiteracy, inability to communicate in English, and lack of past work, these characteristics are not non-exertional limitations. While they are to be considered in determining whether Plaintiff is disabled, they are not a result of any medically determinable impairment and do not factor into the ALJ's decision to use a VE.

D.      Plaintiff's Credibility

In her final argument, Plaintiff contends that the ALJ erred in failing to consider that her persistent efforts to obtain relief from her mental symptoms enhanced her credibility, and erred in implying that she would not be disabled if she complied with her medication regime.

The ALJ is required to make specific findings assessing the credibility of plaintiff's subjective complaints. *Cequerra v. Secretary of HHS,* 933 F.2d 735 (9th Cir. 1991). In rejecting the complainant's testimony, "the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1996)(quoting *Varney v. Secretary of Health and Human Services*, 846 F.2d 581, 584 (9th Cir. 1988)). Once a claimant produces medical evidence of an underlying impairment likely to cause the alleged pain, the ALJ may not discredit the allegations of the severity of the pain solely because the evidence does not support plaintiff's statements. *Lester*, 81 F.3d at 834 (citing *Bunnell v. Sullivan*, 947 F.2d 341, 343 (9th Cir. 1991)(*en banc*)).

The ALJ determined that although Plaintiff had an impairment that could reasonably be expected to produce some of the symptoms she alleged, the degree of limitation alleged was not supported by the objective medical evidence and not entirely credible when evaluated under SSR 96-7p. AR 18. Throughout the decision, the ALJ noted the problems with Plaintiff's allegations. She has been consistently non-compliant in her medication regime and in keeping her appointments, she has no symptoms when she *is* complaint, her problems are predominantly situational and improve when the social obstacle is removed, she was extremely inconsistent during some examinations and may have been malingering, and she gave a questionable response when asked about earnings in 1997, 1998 and 1999. AR 18-20. These are all proper areas of evaluation. *Tidwell v. Apfel*, 161 F.3d 559, 601-601; *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997) (the ALJ may use "ordinary techniques" in addressing credibility); *Macri v.*

*Chater*, 93 F.3d 540, 544 (9th Cir. 1996) (ALJ may make inferences "logically flowing from the evidence."); SSR 96-7p.

The fact that Plaintiff may have been persistent in her efforts to obtain relief does not change this analysis. Indeed, even if Plaintiff could be considered "persistent" in her efforts despite her history of non-compliance, it does not overcome or erase the above factors that weighed against finding Plaintiff credible.

Finally, Plaintiff's argument regarding compliance with medication is misplaced. She cites SSR 82-59 for the proposition that "in order to deny benefits for refusal to follow treatment, the refusal must be willful and without justifiable excuse." Opening Brief, at 16. She then contends that she is an illiterate, Southeast Asian immigrant who had "mental difficulties" in taking the medication. Opening Brief, at 16. She also points to Dr. Lessenger's notation that taking four different medications "may be beyond this client's ability to manage." AR 367. However, SSR 82-59 is not applicable to Plaintiff's case, as it only applies where a claimant has a *disabling impairment* and fails to follow treatment that may restore the claimant's ability to work. Here, the ALJ found that Plaintiff did not have a disabling impairment, and evaluated Plaintiff's noncompliance only in the context of evaluating her credibility.

## **CONCLUSION**

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards. Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Jo Anne B. Barnhart, Commissioner of Social Security and against Plaintiff, Toy Aphayvong.

IT IS SO ORDERED.

**Dated:   May 9, 2005**            /s/ Dennis L. Beck
3b142a                      UNITED STATES MAGISTRATE JUDGE